**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| J.H. and C.H., Individually and<br>As Parents of L.H.,<br>A Minor, | ) <br> ) <br> ) <br> ) |
| Plaintiffs | ) <br> ) |
| v. | )    Civil Action No. 1:21-cv-1947 |
| | ) |
| FRANKLIN TOWNSHIP COMMUNITY<br>SCHOOL CORPORATION, JEFF<br>MURPHY, In His Individual Capacity and<br>MEGGAN MARSHALL,<br>In Her Individual Capacity, | ) <br> ) <br> )   **JURY TRIAL REQUESTED** <br> ) <br> ) |
| | ) |
| Defendants. | ) |

<u>**COMPLAINT AND DEMAND FOR JURY TRIAL**</u>

       Plaintiffs, by counsel, for their Complaint against Defendants and Demand for Jury Trial,

allege:

**I.       PARTIES**

<u>Plaintiffs</u>

     1. Plaintiff L.H. is a 10-year old[1] boy who resides with his mother (Plaintiff J.H. or

        "Mother") and father (Plaintiff C.H. or "Father") (Mother and Father collectively referred

        to as "Parents") in Indianapolis.

<u>Defendants</u>

     2. Defendant Franklin Township Community School Corporation ("the District") is an

        Indiana public school corporation which receives federal financial assistance. The

---

[1] At the time of the events giving rise to this action he was six years old.

District is an "educational institution" as defined by 20 U.S.C. § 1681(c) which operates a "program or activity" as defined by 20 U.S.C. § 1687. Its principal office is located in Marion County, Indiana.

3. At all times relevant, Defendant Jeff Murphy ("Murphy") was an employee of the District acting in the capacity of school Principal.

4. At all times relevant, Defendant Meggan Marshall ("Marshall") was an employee of the District acting in the capacity of school teacher.

## II.    JURISDICTION

5. This Court has jurisdiction over Plaintiffs' claims arising under the Constitution or laws of the United States pursuant to 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 1983. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

## III.    VENUE

6. Venue is in this judicial district pursuant 28 U.S.C. § 1391(b) because the District maintains its principal offices in this district and all events giving rise to this action occurred in this district.

## IV.    ALLEGATIONS COMMON TO ALL COUNTS

7. At all times relevant, L.H. was six years old. Prior to November 2016, he was a bright, happy, inquisitive child who loved school. The events giving rise to this action turned him into a frightened, angry and depressed child who hated going to school.

8. This radical transformation was brought about when L.H. was repeatedly sexually harassed and molested by a male classmate over several months during 2016-2017, shortly after he started 1st grade at Thompson Crossing Elementary School in the fall of

2016. The school is owned, operated, maintained, staffed and funded by Defendant, Franklin Township Community School Corporation (the "District").

9. One day in November 2016 when L.H. came home from school, he told his parents, J.H. and C.H. ("Parents"), that one of his classmates, a 7-year old boy identified herein as K.J., had told him "I want to lick and kiss your butt. I want to lick and kiss your penis. I want to stick my finger in your butt and have sex with you."

10. Some accounts of K.J.'s statements to L.H. describe him using colloquial variations of this type of language or slang terms (e.g., telling L.H. that he wanted to go into the bathroom, have L.H. pull down his pants and suck on his "wee-wee").

11. K.J. made these statements, or statements like them, to L.H. in their classroom and the school lunchroom during school hours.

12. Alarmed to hear such comments attributed to a 7-year old, Parents immediately contacted the school office and reported what L.H. had told them to Defendant Jeff Murphy, the Principal at Thompson Crossing.

13. The next day, Murphy spoke with both boys about what Parents had reported to him. When asked, L.H. recounted what K.J. had said to him, then Murphy spoke to K.J. to hear his side of the story. After speaking with K.J., Murphy told Parents that K.J. had admitted saying those things to L.H. and assured them that the District would "take care of it."

14. On at least one occasion, K.J. had told L.H. that he wanted to kiss him. It is believed that K.J. had a history of kissing other children at school which was known to the District, and had been disciplined by District staff for doing so.

3

15. Upon information and belief, on numerous occasions when L.H.'s class went to the restroom at school, K.J. would tell L.H. that he wanted to lick L.H.'s penis and buttocks, that "I am going to put my penis in your mouth" and "I am going to put my fingers in your butt" (or the slang equivalent). L.H. would later disclose that K.J. was actually performing these acts upon him while the boys were in the school restroom during school hours.

16. K.J.'s statements and actions made L.H. very uncomfortable and frightened of K.J., to the point that eventually he stopped going to the restroom with his class during the class restroom break. Instead, he would remain in the classroom until his class returned, then raise his hand and ask to use the restroom during lunch time; however, K.J. would follow him into the restroom.

17. At all times relevant, Defendant Meggan Marshall was employed by the District and served as L.H.'s teacher. L.H. reported K.J.'s sexual comments to Marshall several times in hopes that she would intervene. In response, she told him to "stop being a tattle-tale."[2]

18. Not surprisingly, Marshall's response led L.H. to conclude that she did not believe him. This caused him to lose trust in her and harbor feelings of resentment and anger towards her.

19. Despite having actual knowledge of K.J.'s history of making sexual comments to L.H., Marshall continued to send L.H. and K.J. to the restroom together unsupervised. During one of these unsupervised bathroom visits, K.J. attempted to kiss L.H. on the buttocks while he was standing at the urinal, but L.H. was able to move out of his way and avoid physical contact.

---

[2] Marshall denies making this statement.

20. Instead of keeping the boys out of the restroom together, upon information and belief, Marshall continued to allow the two boys to use the restroom together—unsupervised— on multiple occasions.

21. In March of 2017, Mother and grandmother met with Murphy and Marshall to discuss what K.J. had been saying and doing to L.H. during the boys' unsupervised visits to the restroom. Marshall's demeanor was cold and emotionless, and when Mother asked her why she continued to allow this to happen, she was shocked by Marshall's response: "My only job is to teach. I just wanted to stay out of it and not get involved."

22. Knowing that the District was required by law to report the inappropriate touching to the Indiana Department of Child Services (DCS), Mother informed Murphy that she would be making her own report to DCS as well.

23. When District employees spoke with K.J. about his sexual comments directed towards L.H., he told them "But I really want to do those things." Despite knowing that K.J. had been making sexual threats to L.H. since at least November 2016, District personnel took no measures to keep the boys apart in December 2016 and January 2017.

24. Upon information and belief, K.J. made sexually inappropriate comments to L.H., kissed or licked L.H.'s buttocks, touched his penis, put his penis in L.H.'s mouth and inserted his finger(s) in L.H.'s rectum in the school restroom on several occasions between approximately November 2016 and February 2017.

25. During these encounters, K.J. would corner L.H. in the bathroom stall, try to kiss him and tell him he wanted to have sex with him. Principal Murphy would later admit knowing that the boys had engaged in "inappropriate activity" in the school restroom.

26. Even before K.J. started touching L.H. sexually, L.H. was already afraid of K.J., who had a history of bullying L.H. on the school bus which included physical assault (tripping him, pushing him down as he attempted to exit and breaking his glasses). The District suspended K.J. from riding the same bus for a couple of weeks before Christmas break, but did not assign him to a different bus and he was allowed to resume riding the same bus in January.

27. Due to his fear of K.J., L.H. experienced anxiety over the possibility of seeing or coming into contact with him at school or on the bus. Mother asked the District to arrange regular sessions with Danielle York, the school guidance counselor, to help L.H. deal with his anxiety, but L.H. reported that York only met with him a few times. On those few occasions when she did meet with him, she did so with another child present and L.H. could not speak privately with York about what had happened with K.J. during those sessions.

28. Eventually, L.H. developed such severe anxiety that he was afraid of even going to school. He continued to struggle emotionally and began having meltdowns at home and school, some of which escalated to physically aggressive behaviors. Sometime in December 2016, he started defecating in his pants. In early 2017, Marshall reported that L.H. was becoming angry in the classroom more frequently. As his outbursts increased in intensity and frequency, Parents became more concerned and sought additional counseling services for L.H. outside of school.

29. Upon information and belief, K.J.'s sexual touching of L.H. in the school cafeteria restroom continued through early February 2017, prompting school staff to take away K.J.'s lunch restroom privileges.

30. One day in music class when K.J. was bothering L.H., L.H. scratched him in self-defense to make him stop. This incident prompted Father to email Murphy on or about February 2, 2017, requesting that the boys be assigned to different classrooms immediately or Parents would have no choice but to withdraw L.H. from the District. Despite Father's request, Murphy did not assign the boys to different classrooms at that time.

31. Heartbroken at his anguish and desperate for help, Parents started taking L.H. to see a therapist at the Indiana Center for Children and Families in February 2017. He presented with complaints of apprehension, irritability, becoming angry, frequent crying, difficulty controlling his bowels, trouble sleeping and a desire to sleep with his Parents, headaches, clinginess and biting his nails.

32. During one of his first sessions in February 2017, L.H. told the therapist that "another boy at school [had] licked his bottom and touched his penis…while they were both in the restroom" and that it had happened several times. Mother and the therapist each called the DCS child abuse hotline and reported L.H.'s account of what had happened at school.

33. L.H.'s disclosure to his therapist came as news to Parents: prior to February 2017, L.H. had not told Parents about K.J. sexually touching him; up until that point they had assumed that K.J.'s conduct directed towards L.H. was limited to verbal comments and that there had been no physical contact between the boys.

34. In mid-February 2017, Principal Murphy emailed Parents informing them that K.J. was continuing to make sexual threats to L.H. Needless to say, after more than three months, Parents were alarmed to learn that K.J.'s behaviors still continued, although it was consistent with L.H.'s account of K.J.'s sexual comments and disturbing behavior in the restroom.

35. Parents renewed their request that the District put the boys in separate classrooms and asked Murphy to create a safety plan to protect L.H. from further contact with K.J. In response, Murphy assigned K.J. to a different classroom for the remainder of the school year, assured them that the District had taken steps to address the situation and developed a safety plan to keep the boys apart, which included putting them in separate classrooms, requiring K.J. to use the nurse's restroom during lunch and telling the boys to stay away from each other during recess. Parents thanked Murphy, then asked him what kind of safety plan the District had developed to protect L.H. in other parts of the building (e.g., the cafeteria, on the playground and on the bus).

36. Murphy told Parents that he had spoken with K.J.'s parents, that K.J. had been assigned a separate restroom, that the boys had been told to "stay away from one another" and that District staff were working on a safety plan for L.H. on the school bus. Parents asked him to come up with a written safety plan for the bus, cafeteria and playground.

37. On or about March 1, 2017, L.H.'s therapist spoke with Principal Murphy. She pointed out that the safety plan which the District had developed to protect L.H. from K.J. at school did not address all of the settings where the boys might encounter one another. Murphy told the therapist that he had spoken with K.J., who corroborated L.H.'s version of events. After Parents and therapist expressed their concern over the lack of details in the District's safety plan, L.H. and his therapist came up with their own.

38. Eventually, L.H. became so paralyzed with fear that he was terrified of going to school at all. Parents asked the District's Assistant Superintendent to approve having him attend another school in the District in order to protect him and spare him further anxiety every time he saw K.J.

39. In response to Parents' request, the District's Assistant Superintendent was almost as callous as Marshall, telling Parents "that is not going to happen" and that the District had "never had a case where that has been allowed."

40. After months of phone calls, meetings, emails and talk of "safety plans," it became clear that the District *still* could not keep L.H. safe; a safety plan is no good if the District does not implement it.

41. One day in March 2017, L.H. was not feeling well at school, so he went to the nurse's office and the nurse sent him home early. On his way back to the classroom to get his things, he encountered K.J. wandering the halls by himself—after the District had assured parents that K.J. would be supervised at all times as part of its "safety plan." K.J. began chasing L.H. down the hallway.

42. Exasperated with the school's inability to keep her son safe after months of asking for help, in the spring of 2017, Parents believed they had no choice but to withdraw him from the District. Mother wrote a letter to the District's Superintendent about the situation. He never responded, so she sent a letter to members of the District's school board recounting what had happened to L.H., along with Marshall's comments and the way the District had handled it: "I cannot believe that my child can be sexually assaulted…and the administration refuse[s] to protect him. We had no other recourse but to withdraw him from Franklin Township Schools. I cannot continue to send my son to a school where he is constantly fearful of being assaulted at the hands of the administration who has the power and ability to protect him but refuses to do what is in his best interest."

43. To her dismay, only two board members responded to her letter, telling her "we are looking into it."

44. Meantime, the District was not implementing the safety plan and L.H. did not feel safe at school. When Mother spoke with the Assistant Superintendent about the situation over the phone, she told Mother that L.H. was not afraid at school and that it was "not his fear, but your fear" that was upsetting Mother.

45. Believing that the District could not keep L.H. safe at school, Parents consulted his private counselor and made the difficult decision to withdraw him from the District in March of 2017 and enroll him in another school district where Mother was employed as a teacher.

46. Starting around October 2017 until December 2018, while he was attending school in the HSE district, L.H. was seeing an outside school-based counselor for monthly family therapy and weekly then bi-weekly individual therapy staffed by Community Health Network Gallahue.

47. Intake paperwork notes a "history of molestation/bullying with peer his age at school last year for approx. 3 months before moving to new school."

48. Session notes from November 2017 reflect that L.H. was having difficulty trusting people due to his experience at his previous school involving "peer violation of his body/space…." He shared with the therapist that he had been "touched by peer inappropriately over period of time in restroom" at his previous school. She noted that his "past trauma…can trigger client with peers in restroom setting at school."

49. The therapist noted that L.H. had spoken with his teacher about a plan for using the restroom "given previous trauma experience at school/bathroom with peer" and his willingness to seek help if he "felt unsafe again like at my old school."

50. In December 2017, his therapist noted that L.H. presented with "both anxiety and ODD behaviors." His "former trauma experiences at school are impacting both client/mom with anxiety related to client's current school experience" and wrote that she was helping L.H. learn to process his feelings of trust towards his teacher given his experience at the previous school.

51. By early January 2018, L.H. told his therapist that he liked school "better" and was much less anxious/worried about coming to school.

52. Notes from another session in January 2018 reflect that L.H. "reports increased trust felt in his school environment…."

53. Session notes from February 2018 reflect that L.H. had shared more details about "my big problem at my old school" with his therapist, "referring to trauma/abuse he experienced with peer…." He reported feeling "much less anxious in his daily school experience" and felt "happy and safe" at his new school, but told his therapist that he "was triggered to feel stress and anxiety" when he overheard Mother mention his history of trauma at his previous school.

54. By early March 2018, L.H. told his therapist that his anxiety was much less than when he started therapy.

55. A session note from April 2018 reflects that L.H. denied any "concerns/worries related to trauma history—abuse at former school with peer—stress is not felt at this time at current school—denies any triggers for this in class, bathroom, etc."

56. Under "Psychosocial Stressors," a session note from May 2018 states "Client had extreme bullying situation at previous school where client was 'forced' to touch peer multiple times in bathroom."

57. In May 2018, session notes reflect that L.H. was happy about his overall school experience since changing schools and was processing his feelings "about abuse trauma history at previous school…." He reported doing better "managing his strong emotions related to trauma history" and less irritability and agitation.

58. In May 2018, the therapist had planned on having L.H. take a break from therapy over the summer, but session notes from June of 2018 reflect that L.H. was experiencing anxiety over Mother's cancer diagnosis and recent surgery, which had some complications.

59. Session notes from July 2018 reflect that L.H. was doing well and looking forward to his new school.

60. In August 2018, session notes reflect that L.H.'s "anxiety level is much less at school now as he gets more time/distance from abuse and trauma history at previous school in first grade." He rated his anxiety level: "use[d] to be 9-10 on a scale of 1-10 and now it is a 3." He told his therapist that "it was great to be in the [football] game last week with the boy who hurt me at my old school and to tackle him too," referring to "trauma history at previous school and how perpetrator was on opposing team…."

61. An earlier session note reflects that the therapist was helping L.H. "process recent incident where he crossed paths with former abuser of molestation at his school during youth football game…." L.H. told his therapist that he had "tackled him really hard and it was good" and described doing so as a therapeutic experience.

62. In early September 2018, session notes reflect that L.H. was reporting "much less anxiety and impact from trauma experience from 2016…."

63. In September 2018, session notes reflect that L.H. had seen K.J. at a football game.

64. During one session in October 2018, L.H. told his therapist that he was seeing K.J. at school football games, but therapist wrote that he "seems to be healing and recovering from trauma history after 2+ years and has no indicators in current school environment [HSE] for stress/anxiety associated with this event."

65. Session notes from November 2018 reflect diagnoses of Generalized Anxiety Disorder and Major Depressive Disorder, recurrent unspecified/severe.

66. At his last session in December 2018, L.H. was diagnosed with Generalized Anxiety Disorder and Major Depressive Disorder.

67. After making significant progress in his school-based therapy, L.H. was discharged from the Gallahue school-based therapy program in March 2019 with a diagnosis of Major Depressive Disorder, recurrent unspecified.

68. Going to a different school seemed to help alleviate L.H.'s anxiety, but he missed his friends, wanted to play sports and the commute from the family home was almost an hour each way. Therefore, in the fall of 2019 (4th grade), Parents asked the District's new Assistant Superintendent if L.H. could re-enroll and attend a different school in the District, South Creek Elementary.

69. To their surprise, the District granted their request and L.H. was allowed to attend 4th grade at South Creek before the family learned that the following year he would be attending 5th grade at his home school, an intermediate school where Marshall would be teaching.

70. In the fall of 2019, L.H. saw K.J. at a football game, prompting him to run across the field, jump on him and punch him. When Mother asked him why he did that, L.H. said "I

wanted his face in the dirt so he knew how it felt when he had my face on the bathroom floor."

71. In December 2019, Mother emailed the school counselor asking about enrolling L.H. in a school-based counseling program to help him deal with his anxiety and anger. The school counselor informed her that the District has a partnership with Adult & Child Health, a nonprofit provider of mental health services, which could staff L.H. with a school-based skills specialist or therapist.

72. One week in February 2020, L.H. was being bullied by a group of students at school and expressed suicidal thoughts because of his belief that nobody cared about him (as evidenced by Marshall's comments). One day when the students were bullying L.H. at school, one of them was poking him with a pencil, then threatened to bring a knife to school and stab him. The same child told L.H. that he was going to bring a gun to school and shoot him in the face. Mother reported both incidents to District administrators.

73. That evening, L.H. came home from school distraught over the bullying and threats. He told Parents that he was contemplating suicide, so they took him to the emergency department at Community Hospital South for a psychiatric assessment. Hospital staff recommended that he be admitted at Community Hospital North (which has a behavioral unit); however, there were no beds available at that facility, so he was discharged to home where Parents could keep an eye on him.

74. When L.H. and Mother got into an argument over where to sit in the family vehicle, L.H. said "maybe people would be better off without me" and threatened to stab himself with a kitchen knife. Father took L.H. to the grocery store in an attempt to de-escalate him. As they were leaving, Father asked L.H. if he felt safe going home and L.H. responded that

14

he was not sure, so Father took L.H. to Community Health Network's Gallahue North

Crisis Center that night where he was seen by a counselor.

75. Upon arrival, Father told staff about L.H.'s history of anxiety and depression which

"started after patient was sexually assaulted by another student at school...in the 1st

grade."

76. Father also told hospital staff that on Valentine's Day, someone wrote "Gay" on L.H.'s

bag at school. Father shared with Gallahue staff that the same week that another student

had threatened to stab L.H. and that earlier on that same day (February 27th), the same

student had threatened to "shoot him the face tomorrow."

77. Gallahue staff recommended that L.H. be admitted as an inpatient; however, Parents did

not want him admitted that night, so they opted to take him home where he remained

under his grandmother's supervision. Gallahue gave them a referral to an Adult & Child

behavioral health practitioner.

78. After Parents met with staff from Adult & Child Health and District personnel to develop

a safety plan, L.H. returned to school in the District at South Creek Elementary.

79. L.H. started seeing a school-based Adult & Child mental health counselor in March of

2020. The intake assessment dated 3/6/20 reflects Mother's report that L.H.'s "Behaviors

have been escalating since about October when he a saw a peer who had sexually abused

him" at a football game. She relayed that L.H. had expressed suicidal thoughts the week

before after a peer threatened to bring a knife to school then threatened to bring a gun to

school and shoot L.H.

80. Mother shared the history that when he was in 1st grade, a peer had sexually assaulted

him for about four months.

81. L.H. made progress in therapy and was discharged with a diagnosis of an adjustment disorder with anxiety. His doctor prescribed an antidepressant.

82. In the spring of 2020, Mother told the District's Assistant Superintendent that L.H. was slated to attend 5th grade in the fall at his home school, where K.J. would also be attending and where Marshall would be teaching—putting him right back in the same situation as before.

83. The Assistant Superintendent refused Mother's request to allow L.H. attend a different intermediate school than his home school, without offering any explanation other than the usual "District policy."

84. In March of 2020 (4th grade), the District developed a Section 504 Plan for L.H. with accommodations to address his anxiety. According to that plan, "L.H. has been diagnosed with Generalized Anxiety Disorder. He has struggled with this diagnosis since the age of 7."

85. A couple of weeks later, all Indiana public schools were closed due to the novel Chinese coronavirus pandemic.

86. Also in the spring of 2020, Parents learned that the District planned to open intermediate schools for students in 4th-6th grade in the fall of 2020. Marshall was assigned to teach 5th grade at Edgewood Intermediate, the school where L.H. was slated to attend 5th grade. K.J. would also be attending the same school.

87. During a session with the Adult & Child counselor in May 2020, Mother shared that L.H. would be attending the same school as K.J. and Marshall in the fall.

88. Concerned about L.H. being in the same building as Marshall and K.J., during the summer of 2020, the family met with the Principal at the intermediate school that L.H.

would be attending in the fall in order to make sure that he would not have any

interaction with either of them and that there were supports in place to ensure a smooth

transition.

89. During the summer of 2020, Mother contacted the school counselor at Edgewood

Intermediate School to make her aware of L.H.'s situation. Instead of offering more help,

in August of 2020, the counselor proposed removing two of the accommodations in

L.H.'s 504 Plan. Mother objected and asked the counselor to keep all provisions of his

504 Plan intact.

90. By September 2020, L.H. did not even know who the school counselor was, suggesting

that having her meet with him was not a priority for the District and compounding

Parents' frustration. Parents also learned that L.H. had to walk past Marshall's classroom

every day, and it was his perception that she gave him "attitude" whenever she saw him

(e.g., rolling her eyes and giving him "dirty snarls").

91. L.H. felt betrayed by Marshall for not believing him and failing to protect him four years

earlier, feelings which were resurrected when he found himself once again going to

school in the same building with her. This resulted in a long-term loss of trust in teachers

and counselors in general, which he still demonstrated during individual counseling

sessions three years later. It undermined his already fragile self-esteem and he no longer

felt welcome at Edgewood.

92. One day in September 2020, the District held a school-wide "body safety" talk. Still

angry and betrayed over Marshall's failure to address the abuse which he had suffered at

the hands of K.J. during 2016-2017, this triggered L.H. to send her an email saying "You

don't care about your students you are a bad person."

93. In the fall of 2020, L.H. began to display new and troubling behaviors. Once a good kid who loved school, since the beginning of that school year his behaviors started getting him into trouble. He lost interest in things which he used to love (basketball), began falling asleep in class, talking back to his teachers and having sudden mood swings. He became defiant and aggressive, getting into a physical fight at school. He toilet papered the school restroom and clogged the toilets. Mother found a video which L.H. had made of himself naked smearing feces on himself and posted on the social media site TikTok. He stood in the sink and urinated. He started a fire in Parents' garage by lighting cardboard boxes soaked in gasoline. Parents suspected that seeing K.J. and Marshall at school was triggering these behaviors.

94. In September 2020, Mother told the Adult & Child therapist that L.H. had become even more irritable, aggressive, impulsive and defiant. He locked Parents out of their house, requiring them to call the police to get back in.

95. One day during the last week of September 2020, L.H. was being bullied at school by a child who was insulting his religion and called his black friend a "nigger," so L.H. "snapped" and punched the bully in the chest.[3] He was suspended as a result. When L.H. and Parents were visiting his grandmother, he threatened to hang himself with "a rope in the garage that my dad uses for work."

96. This was not the first time L.H. had thought about taking his own life. In March of 2020, he had threatened to commit suicide by hanging himself.

97. Around midnight on 9/27/20, the parents took L.H. to the St. Vincent Stress Center where he was admitted as an inpatient in the psychiatric unit with a history of depression and

---

[3] Another entry states he punched him in the face but, under the circumstances, doing either appears justifiable.

sexual abuse. He was then stepped down to partial hospitalization then its intensive

outpatient program until 10/19/20 for treatment of depression and anger.

98. The Stress Center social work initial assessment entry notes that:

Parents report that patient was sexually abused in 1st grade for four months by classmate at
school. The perpetrator reportedly climbed underneath the bathroom stall and touched patient
and forced oral sex. Patient reportedly told his teacher multiple times and he was advised by her
not to tattle. Over the past several years since this incident, patient has struggled with feelings of
depression, anxiety, acting out aggressively and suicidal ideation. Family reports that when
patient started school this fall, the teacher he had in 1st grade as well as the student who abused
him were both at his new middle school after having not been around them for the past several
years. This…triggered his anxiety and patient has been acting increasingly erratic including
setting a fire in the garage last week, using an electric chainsaw, posting naked videos on [Tik
Tok] covered in feces, and sending money to someone he met online. Parents report that patient
sent an email recently to the teacher asking her why she didn't protect him.

99. While L.H. was in therapy at the Stress Center, another child in his therapy group told

L.H. that he had been watching him through his window and said "I know where you live

and will come to your house and rape you."

100. Upon information and belief, the other boy made the threat after L.H. had shared his

experience at school with the group.

101. The two boys had no prior history together, but the boy also happened to attend

Edgewood Intermediate, the same school as L.H. The Stress Center staff addressed the

situation immediately and recommended that L.H. take a week off from therapy because

of the threats.

102. After completing his treatment at the Stress Center, discharge summary notes reflect

L.H.'s history of being sexually abused by a classmate in the restroom at school: "Over

the past several years since that incident the patient struggled with feelings of depression,

anxiety, acting out aggressively and suicidal thought." The notes state that when L.H.

went back to school in the fall, the perpetrator (K.J.) was there, which "triggered a variety

of anxiety symptoms, [he] tried cutting things with [an] electric chainsaw, and had a relationship with someone he met online. Patient reports nightmares and increased anxiety…and believes if he hangs himself he gets to go to Heaven and see his dogs….Family discussed past abuse and ultimately the decision was made to switch schools…."

103. Other entries echo these reports: "student who sexually abused [L.H.] in 1st grade is back at the same school this year," "Teacher who patient confided in about abuse is at his school this year," "Patient was reportedly abused multiple times while in 1st grade by another classmate," "Patient reportedly told his teacher several times and she told him 'not to tattle' resulting in the abuse continuing for four months before his parents found out," L.H. started "defecating in his pants and wetting the bed," "offender and the teacher are again at the same school patient is at [sic] and he sees them daily," "Teacher was reportedly never disciplined for not reporting the abuse."

104. Another entry in the Stress Center chart states "Patient reports in 1st grade he thought about killing his teacher: 'I wanted to shoot a gun in her head.'" Psychosocial stressors are listed as "recent exposure to perpetrator of trauma, bullied at school with fighting and suspension" and there is reference to "recent daily exposure to perpetrator of sexual trauma."

105. During one of his sessions at the Stress Center, L.H. told his therapist that he had been upset for two years "so I hurt myself" by stabbing himself with a pencil at school.

106. L.H. was discharged from the Stress Center with diagnoses of Major Depressive Disorder, recurrent severe and Oppositional Defiant Disorder. He was prescribed Wellbutrin (an antidepressant; changed from previous Rx for Prozac) and therapy.

107. After being discharged from the Stress Center, starting in October 2020 L.H. started receiving counseling services through Legacy House at Eskenazi Health Center. He presented with a chief complaint of depression and a history of sexual abuse, suicidal ideation and attempted suicide. He had feelings of anger and was experiencing flashbacks. He was still defecating in his pants and even little things (e.g., being asked to put on his shoes) would trigger a meltdown.

108. In December 2020, L.H. was discharged from his Adult & Child therapy program because he was seeing a therapist at Legacy House. His diagnoses were Major Depressive Disorder, Other Reaction to Severe Stress and Child Sexual Abuse.

109. Parents did not feel comfortable sending L.H. back to school in the District, so they enrolled him in a private school. Since then, his behaviors have improved dramatically and he has been doing much better.

## V.    CLAIMS FOR RELIEF

### COUNT 1:  TITLE IX
*Against Franklin Township Community School Corporation*

110. Plaintiffs incorporate by reference their previous allegations as if set forth fully herein.

111. This claim is brought pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. and its implementing regulations.

112. Traditionally, Title IX claims have arisen primarily in the context of intercollegiate sports and on university campuses. In recent years, however, there has been a troubling rise in the prevalence of sexual harassment among school-age children.

113. Some scholars believe that almost 50% of students in grades 7-12 are victims of sexual harassment each year.[4]

---

[4] Catherine Hill and Holly Kearl, *Crossing the Line: Sexual Harassment at School* (2011).

114. In 2019, the U.S. Department of Education Office for Civil Rights received nearly 15 times more complaints involving sexual violence among K-12 students than it had a decade before.[5]

115. The trauma of experiencing sexual harassment and assault during early childhood can have significant long-term consequences on a child's learning and behavior.[6]

116. The District operates education programs or activities that receive federal financial assistance; namely, public schools.

117. As a student enrolled in the District, at all times relevant K.J. was subject to the disciplinary authority or control of the District.

118. At all relevant times, L.H. was on District property during school hours when he was subjected to multiple instances of sexual harassment and sexual assault by K.J.

119. While the ages of the children involved in student-on-student harassment may be a relevant consideration in some situations, in this case the statements and actions of K.J. were far more serious than the typical horseplay that one would expect from six- and seven-year-olds and which school administrators often dismiss as harmless "kids will be kids" shenanigans.

120. K.J.'s words and conduct towards L.H. at school went beyond immature or "inappropriate" behavior and were much worse than the sort of taunting, teasing or name-calling that children this age have always (and will always) perpetrate on each other.

---

[5] U.S. Office for Civil Rights, *2017-2018 Civil Rights Data Collection: Sexual Violence in K-12 Schools* (2020), accessible at https://www2.ed.gov/about/offices/list/ocr/docs/sexual-violence.pdf .
[6] Bucci, *et al., Toxic Stress in Children and Adolescents,* 63 ADVANCES IN PEDIATRICS 403 (2016); Goodman, *et al., Traumatic Stress, Socioeconomic Status and Academic Achievement Among Primary School Students,* 4 PSYCHOLOGICAL TRAUMA: THEORY, RESEARCH, PRACTICE AND POLICY 245 (2012).

121. In contrast to such commonplace childhood antics, the sexual harassment of and assaults upon L.H. were so severe, pervasive and objectively offensive that they denied him access to the education program or activity operated by the District, eventually forcing him to withdraw from school.

122. Were he an adult, the sexual acts which K.J. performed upon L.H. would constitute criminal conduct under Indiana law.

123. Due to L.H.'s age at the time (six years old), he was incapable of consenting to any sexual acts with K.J.

124. Upon information belief, K.J. was aware of the sexual nature of his words and conduct towards L.H. and the seriousness of same; K.J. was knowingly engaging in sexual acts.

125. At a minimum, K.J.'s words and conduct were undertaken "on the basis of sex."

126. L.H. and Parents reported the sexual harassment and assaults to District employees (including administrators) on multiple occasions.

127. K.J. admitted to District employees, on one or more occasions, to engaging in such conduct or otherwise corroborated L.H.'s complaints to District employees, including but not limited to Murphy and Marshall.

128. At all times relevant, K.J. was under the disciplinary authority of the District. Murphy and Marshall had actual knowledge of K.J.'s words and conduct; both had the authority to address it and take measures to stop it, yet both failed to adequately respond to L.H.'s and Parents' complaints.

129. Even if Marshall lacked authority to discipline K.J. as a teacher, as Principal Murphy had such authority.

130. The District had actual knowledge that L.H. was being sexually harassed and sexually assaulted by K.J. on school property during school hours.

131. Despite such actual knowledge, the District's response (or failure to respond promptly) to such conduct (e.g., Marshall telling L.H. to "stop being a tattle-tale") was clearly unreasonable in light of the known circumstances. Therefore, the District's response—or failure to respond—to the harassment constitutes deliberate indifference.

132. The District failed to properly investigate L.H. and Parents' reports of sexual harassment and/or assault.

133. The District failed to provide appropriate supportive measures or accommodations following L.H. and Parents' reports of sexual harassment and/or assault.

134. The District failed to take appropriate steps to address or stop the sexual harassment and/or assaults.

135. The District had a policy, custom or practice of not treating complaints of student-on-student harassment by male victims as sexual harassment (particularly when the perpetrator is also a male) and of not investigating them as such, even when the perpetrator's words or conduct is clearly sexual in nature.

136. Pending further investigation and discovery, there may be additional grounds for liability if the District did not designate a Title IX coordinator or establish and disseminate formal policies or procedures for filing a grievance or complaint of sexual harassment and/or responding to reports of harassment or assault.

137. K.J.'s words and conduct constitute sexual harassment and sexual assault.

138. The District's response, or failure to respond, to the harassment was clearly unreasonable under the circumstances and amounts to deliberate indifference.

139. The District's deliberate indifference to the sexual harassment of and sexual assault upon L.H. denied him equal access to an education, resulting in a tangible, negative effect on his education.

140. Specifically, K.J.'s harassment was so serious, severe and pervasive that it forced Parents to withdraw L.H. from the District and enroll him in a private school, thereby denying him equal access to educational opportunities afforded other students and causing Parents to incur the costs of tuition and fees associated with the private school.

## COUNT 2:  SECTION 1983
### *Against Franklin Township Community School Corporation, Jeff Murphy and Meggan Marshall*

141. Plaintiffs incorporate their previous allegations as if fully set forth herein.

142. This claim is brought pursuant to 42 U.S.C. § 1983.

143. The District, Murphy and Marshall are "persons" for purposes of 42 U.S.C. § 1983.

144. At all times relevant, Murphy and Marshall were acting under color of state law.

145. Murphy and Marshall acted, or failed to act, with deliberate indifference to L.H.'s right to access educational opportunities in an environment free from sexual harassment.

146. Murphy and Marshall's actions (and inaction) in response to the harassment were clearly unreasonable in light of the known circumstances.

147. As a direct and proximate result of Defendants' deliberate indifference, Plaintiffs sustained damages.

## COUNT 3:  NEGLIGENCE
### *Against Franklin Township Community School Corporation*

148. Plaintiffs incorporate their previous allegations as if fully set forth herein.

149. This claim is brought under Indiana law against the District only.

150. At all times relevant, the District owed L.H. a duty of reasonable care and supervision.

151. The District had a duty to protect L.H. from the reasonably foreseeable conduct of K.J.

152. The District breached these duties by failing to exercise reasonable care and supervision of students in its school, including L.H. and K.J., and failing to protect L.H. from the reasonably foreseeable conduct of K.J.

153.  As a direct and proximate result of the District's negligent acts or omissions, L.H. sustained personal injuries and emotional distress, and Parents sustained damages, including but not limited to medical expenses and costs related to private school.

## VI.     RELIEF SOUGHT

WHEREFORE Plaintiffs, by counsel, respectfully request the following relief:

1. Judgment in their favor and against Defendants;

2. Damages in an amount sufficient to compensate them for their losses;

3. Reasonable attorney fees pursuant to 42 U.S.C. § 1988;

4. Pre- and post-judgment interest;

5. Costs; and

6. All other relief reasonable in the premises.

Respectfully submitted,

/S/Thomas W. Blessing
Thomas W. Blessing (#15696-49)
MASSILLAMANY JETER & CARSON, LLP
11650 Lantern Road, Suite 204
Fishers, IN 46038
Telephone: (317) 576-8580
Facsimile: (317) 203-1012
E-mail:  tom@mjcattorneys.com

*Attorney for Plaintiffs*